ROBERT J. TUERCK (Bar No. 255741)
Jackson & Tuerck
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: (530) 283-0406
E-mail: bob@jacksontuerck.com

ANDREW L. PACKARD (Bar No. 168690)
ERIK M. ROPER (Bar No. 259756)
HALLIE B. ALBERT (Bar No. 258737)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>RECOLOGY OF BUTTE COLUSA COUNTIES, et. al.<br><br>　　　　　　　　Defendants. | Case No. 2:10−CV−01231−KJM−DAD<br><br>**STIPULATION TO APPROVE CONSENT AGREEMENT AND TO DISMISS PLAINTIFF'S CLAIMS WITH PREJUDICE; ORDER APPROVING CONSENT AGREEMENT AND GRANTING DISMISSAL WITH PREJUDICE [FRCP 41(a)(2)]**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

TO THE COURT:

　　Plaintiff California Sportfishing Protection Alliance ("PLAINTIFF" or "CSPA"), and

Defendant Recology of Butte Colusa Counties ("RECOLOGY"), (collectively, the "Parties")

stipulate as follows:

**WHEREAS**, on or about March 17, 2010, CSPA provided RECOLOGY and Joe Matz ("MATZ"), the manager of the relevant Recology facility, with a Notice of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, on May 19, 2010, CSPA filed its Complaint against RECOLOGY and MATZ in this Court, *California Sportfishing Protection Alliance v. Recology of Butte Colusa Counties, et al.*, (USDC, E.D. Cal., Case No. 2:10−CV−01231) and said Complaint incorporated by reference all of the allegations contained in CSPA's 60-Day Notice Letter dated March 17, 2010;

**WHEREAS**, on May 28, 2010, CSPA filed its First Amended Complaint against DEFENDANTS in this Court, *California Sportfishing Protection Alliance v. Recology of Butte Colusa Counties, et al.*, (USDC, E.D. Cal., Case No. 2:10−CV−01231) and said First Amended Complaint incorporated by reference all of the allegations contained in CSPA's 60-Day Notice Letter dated March 17, 2010;

**WHEREAS**, on or about June 10, 2010, CSPA provided RECOLOGY and MATZ with a Notice of Violation of California Health and Safety Code § 25249.5 et. seq. ("Prop 65 Notice");

**WHEREAS**, RECOLOGY waived service of CSPA's First Amended Complaint on or about September 15, 2010;

**WHEREAS**, CSPA has not served either the May 19, 2010 Complaint, nor the First Amended Complaint on MATZ;

**WHEREAS**, neither RECOLOGY nor MATZ have pending counter-claims in this action;

**WHEREAS**, CSPA and RECOLOGY, through their authorized representatives and without either adjudication of CSPA's claims or admission by RECOLOGY of any alleged violation or other wrongdoing, have chosen to avoid the costs and uncertainties of further litigation and to resolve the allegations of CSPA as set forth in the 60-Day Notice Letter, the

Prop 65 Notice, and the Amended Complaint, in full by way of settlement.  A copy of the agreement ("Consent Agreement") entered into by CSPA and RECOLOGY is attached hereto as **Exhibit A** and incorporated by this reference;

      **WHEREAS**, CSPA agreed, as reflected in the Consent Agreement, to dismiss claims against MATZ.  Since the matter between CSPA and RECOLOGY is now fully resolved via settlement, as reflected in the Consent Agreement, the Parties agree that the dismissal of MATZ will be with prejudice;

      **WHEREAS**, the Parties submitted the Consent Agreement via certified mail, return receipt requested, to the U.S. Environmental Protection Agency and the U.S. Department of Justice ("the Agencies") and the 45-day review period set forth at 40 C.F.R. § 135.5 has been completed without objection by the agencies; and

      **WHEREAS**, the Department of Justice responded, on behalf of the Agencies, to the notice of the Consent Agreement with no objection to the settlement, as reflected in Docket Entry No. 13 (LETTER regarding review of proposed Consent Decree by United States).

      **NOW THEREFORE, IT IS HEREBY STIPULATED** and agreed to by and between the Parties that:

      1.     That the Court be requested to approve the Consent Agreement attached hereto as Exhibit A and enter judgment in therewith;

      2.     CSPA's claims against RECOLOGY and MATZ, as set forth in the 60-Day Notice Letter and First Amended Complaint, be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties respectfully request an order from this Court dismissing such claims with prejudice; and

/

/

/

/

/

3.      In accordance with Paragraph 18 of the Consent Agreement, the Parties also request that this Court retain and have jurisdiction over the Parties, for the sole purpose of resolving any disputes between the Parties with respect to enforcement of any provision of the Consent Agreement, through the termination date of the Consent Agreement stated in Paragraph 20.

DATED:  February 25, 2011               JACKSON & TUERCK

                                        /s/ ROBERT TUERCK

                                        _____/S/_____
                                        Robert J. Tuerck
                                        Attorney for Plaintiff
                                        CALIFORNIA SPORTFISHING PROTECTION
                                        ALLIANCE


DATED:  February 25, 2011               BARG COFFIN LEWIS & TRAPP, LLP

                                        /s/ TOM BOER

                                        _____/S/_____
                                        J. Tom Boer
                                        Attorney for Defendant
                                        RECOLOGY OF BUTTE COLUSA COUNTIES

ORDER

**WHEREAS**, the Parties have consented to entry of the foregoing Consent Agreement and requested the Court's approval and entry thereof; and

**WHEREAS**, pursuant to 33 U.S.C. § 1365(c)(3), the Parties submitted the Consent Agreement to the United States Attorney General and the Administrator of the United States Environmental Protection Agency and the 45-day review period has been completed without objection by the agencies, but with comments having been filed by the U.S. Department of Justice;

**WHEREAS**, the Court has reviewed the Consent Agreement and fully considered the Parties' request to enter this Consent Agreement as an order; and

**WHEREAS**, the Court finds the Consent Agreement to be: (1) fair, adequate and reasonable; (2) consistent with applicable laws; and (3) protective of the public interest; and

**WHEREAS**, good cause appearing therefore, IT IS HEREBY ORDERED that:

1.      The Consent Agreement attached hereto as Exhibit A is hereby approved and judgment is entered in accordance therewith;

2.      Plaintiff California Sportfishing Protection Alliance's claims against Recology of Butte Colusa Counties ("RECOLOGY") and Joe Matz, an individual, as set forth in the 60-Day Notice Letter and First Amended Complaint filed in Case No. 2:10−CV−01231−KJM−DAD, are hereby dismissed with prejudice.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties, solely with respect to disputes arising under the Consent Agreement attached hereto and to the Parties' Stipulation to Dismiss as **<u>Exhibit A</u>**.

IT IS SO ORDERED.

Dated:  March 4, 2011.

_____
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

# EXHIBIT A

ROBERT J. TUERCK (Bar No. 255741)
Jackson & Tuerck
P. O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: (530) 283-0406
E-mail: bob@jacksontuerck.com

ANDREW L. PACKARD (Bar No. 168690)
ERIK M. ROPER (Bar No. 259756)
HALLIE B. ALBERT (Bar No. 258737)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>RECOLOGY OF BUTTE COLUSA COUNTIES, fka NORCAL WASTE SYSTEMS OF BUTTE CO., a California corporation, and JOE MATZ, an individual<br><br>Defendants. | Case No. 2:10–CV–01231–FCD–DAD<br><br>**[PROPOSED] CONSENT AGREEMENT**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendant RECOLOGY OF BUTTE COLUSA COUNTIES (hereinafter

"RECOLOGY" or "Defendant") owns an approximately eleven (11) acre waste transfer and recycling facility located at 2720 S. Fifth Avenue, in Oroville, California (the "Facility") (a map of the Facility is attached hereto as Exhibit A and incorporated herein by reference);

WHEREAS, Defendant JOE MATZ, General Manager of the Facility, was not served by CSPA, and is to be dismissed from this action without prejudice;

WHEREAS, CSPA and Defendant collectively shall be referred to as the "Parties;"

WHEREAS, the Facility collects and discharges storm water into the Dry Creek Drainage Canal that is part of the City of Oroville's storm water conveyance system which discharges to the Feather River. The Feather River ultimately flows into the Sacramento River, and the Sacramento-San Joaquin Delta;

WHEREAS, storm water discharges associated with certain industrial activity in California are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ) (the "General Permit"), issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (the "Act");

WHEREAS, on or about March 17, 2010 Plaintiff provided notice of Defendant's alleged violations of the Act, and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (true and correct copies of CSPA's notice letters are attached as Exhibit B and incorporated herein by reference);

WHEREAS, on or about June 10, 2010, Plaintiff provided notice of Defendants' alleged violations of California Health & Safety Code § 25249.5 *et seq*. (referred to as "Proposition 65") ("Proposition 65 Notice Letter"), and of its intention to file suit against Defendants to the Proposition 65 Enforcement Reporting section of the office of the California Attorney General ("California Attorney General"); the District Attorney of each California county containing sources of drinking water potentially impacted by Defendants' violations of Proposition 65 as described in the Proposition

- 2 -

65 Notice Letter; and, to Defendants, as required by California Health & Safety Code; Section 25249.5 *et seq.* (true and correct copies of CSPA's "Proposition 65 Notice of Violations Letter" is attached as Exhibit C and incorporated herein by reference);

**WHEREAS,** unless otherwise noted, the Clean Water Act Notice Of Violations Letter and the Proposition 65 Notice of Violations Letter shall hereinafter collectively be referred to as "the Notices";

**WHEREAS,** Defendant maintains that it has been, at all relevant times, and continues to be, in compliance with the Clean Water Act, the General Permit, and Proposition 65, and denies the occurrence of the violations alleged in the Notices;

**WHEREAS,** Defendant denies any and all claims in the Notices;

**WHEREAS,** CSPA filed a complaint ("Complaint") against Defendants in the United States District Court, Eastern District of California, on May 19, 2010 and filed a First Amended Complaint on May 28, 2010;

**WHEREAS,** for purposes of this Consent Agreement, the Parties stipulate that venue is proper in this Court, and that the Defendant does not contest the exercise of jurisdiction by this Court to enter this Consent Agreement;

**WHEREAS,** this Consent Agreement shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and shall thereafter be submitted for approval by the Court, the date of which approval shall be referred to herein as the "Court Approval Date;"

**WHEREAS,** at the time the Consent Agreement is submitted for approval to the United States District Court, CSPA shall request a dismissal of the Complaint with prejudice and the Parties shall stipulate and request that the Court retain jurisdiction for the enforcement of this Agreement as provided herein;

**AND WHEREAS,** the Parties agree that it is in their mutual interest to resolve this matter without further litigation or expense.

[PROPOSED] CONSENT AGREEMENT

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

## I.    COMMITMENT OF DEFENDANT

**1.    Compliance with General Permit and Clean Water Act.** From the time of the Court Approval Date and throughout the term of this Consent Agreement, Defendant shall maintain all measures needed to operate the Facility in full compliance with the requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

**2.    Defendant's Implementation of Specific Storm Water Best Management Practices on or Before January 31, 2011.** Unless otherwise specified, on or before January 31, 2011, Defendant shall complete the implementation of the following storm water control measures/best management practices ("BMPs"), all of which shall be reflected on Exhibit A:

(a)    Defendant shall construct and install a storm water infiltration and retention basin ("Basin #1") that will drain to existing Outfall A through a vegetated bioswale which will be installed to accept storm water flows currently directed towards Outfall B;

(b)    Defendant shall construct a notched concrete weir to be incorporated into the redesigned Outfall A discharge point;

(c)    Defendant shall eliminate, in its entirety, the discharge location currently designated as "Outfall B";

(d)    Defendant shall install a pipe or conveyance system to redirect storm water flow from the current Outfall B to Basin #1;

(e)    Defendant shall construct and install a roll curb at the southwest entrance of the green waste area to prevent storm water from flowing towards the current Outfall B and shall redirect storm water from the public drop-off area toward Outfall A;

(f)    Defendant shall alter the public exit from the Facility's green waste receiving area to ensure that storm water runoff from the vicinity of the public drop-off of green waste flows towards the storm water collection area of Outfall A;

(g)    Defendant shall install a new gate in the existing fencing to redirect public traffic in the green waste area and minimize traffic in tributary areas Outfall C and former Outfall B.

- 4 -

(h)     Defendant shall remove the southernmost drop inlet that leads to Outfall B –
removal of the drop inlet shall include permanently closing the drain inlet and sealing it off with a steel
plate and silicon sealant, or the equivalent;

(i)     Defendant shall install a "K-rail" barrier with a concrete curb on the west side of
the green waste collection area to separate the storage building area from the green waste receiving
area;

(j)     Defendant shall construct and install a storm water infiltration and retention
basin ( "Basin #2") along the Facility's northern fence line in the area north of the existing "toter
assembly" and "appliance storage" areas;

(k)     Defendant shall install a drop inlet north of the existing "toter assembly" and
"appliance storage" areas to direct storm water from the area towards Basin #2;

(l)     Defendant shall redirect storm flows from the north and west of the curbed K-
rail to the northern drop inlet and Basin #2;

(m)     Defendant shall redirect the rain gutters on the appliance storage building so that
storm water from the roof flows toward the northern drain inlet and Basin #2;

(n)     On or before April 29, 2011, Defendant shall install two roll curbs or asphalt
berms to redirect storm water flows away from the Outfall C, and former Outfall B, catchment areas
towards the northern drop inlet.  The installation of the roll curbs will require dry pavement, warmer
temperatures, and the availability of asphalt, which requires a completion date beyond January 2011;

(o)     Defendant shall annually cover the Facility's drop inlets during the dry season
(June through September) and shall uncover the drop inlets no later than September 30th each year;

(p)     Defendant shall make weekly inspections during each wet season (October 1st
through May 31st) of the media for each of the Triton catch basin filters in the drop inlets and shall
replace the media as needed during the storm water season;

(q)     Defendant shall inspect and maintain the existing rock swale and straw wattle
treatment system upstream of the existing inlet to Outfall C quarterly to ensure proper operation of the
system;

- 5 -

(r)     Defendant shall design and install an engineered sand filter system in the area downstream of the existing rock swale and straw wattle treatment system and immediately upstream of the existing inlet to Outfall C;

(s)     Defendant shall inspect and maintain the Outfall C sand filter, including inspections of the sand filter no less than quarterly during the wet season (October through May) to ensure proper operation of the filter;

(t)     Defendant shall redirect rain gutters and down spouts on the maintenance shop to the northwest so that storm water flows away from Outfall C;

(u)     Defendant shall relocate the tire collection and storage container away from the vicinity of Outfall C;

(v)     Defendant shall relocate the boxcar storage unit and the spare parts storage/bone yard from the southwest corner of the Facility;

(w)     Defendant shall relocate the storage area for appliances and white goods to an indoor location so that all incoming appliances will be stored and handled indoors pending off-site shipment;

(x)     Defendant shall reinforce and maintain the Facility's southern berm line from Outfall C to the south fence line to minimize potential off-site discharge of storm water;

(y)     Defendant shall, within three business days of the time that visible waste residue is observed, steam clean or power wash any paved areas of the Facility, including but not limited to the vicinity of the recyclables redemption area;

(z)     Defendant shall amend the Facility's monitoring plan to incorporated a weekly visual inspection of the Facility's paved areas for evidence of waste residue in order to determine if steam cleaning is required.

3.     **SWPPP Amendments/Additional BMPs.**  No later than February 28, 2011, Defendant shall formally amend its SWPPP for the Facility to incorporate all of the relevant requirements of this Consent Agreement, as well as the revised Facility map attached hereto as Exhibit A.

- 6 -

4.      **Sampling Frequency.** Defendant shall collect and analyze samples from four (4) storm events, as qualified in the General Permit[1] for sampling purposes, in each of the three Wet Seasons occurring during the term of this Consent Agreement (2010-2011, 2011-2012, and 2012-2013). The storm water sample results shall be compared with the values set forth in Exhibit D, attached hereto, and incorporated herein by reference. If the results of any such samples exceed the parameter values set forth in Exhibit D, Defendant shall comply with the "Action Memorandum" requirements set forth below.

5.      **Sampling Parameters.** All samples shall be analyzed for each of the constituents listed in Exhibit D by a laboratory accredited by the State of California. All samples collected from the Facility shall be delivered to the laboratory consistent with industry and sampling standards to ensure that sample "hold time" is not exceeded. Analytical methods used by the laboratory shall be adequate to detect the individual constituents at or below the values specified on Exhibit D. Sampling results shall be provided to CSPA within ten business (10) days of Defendant's receipt of the laboratory report from each sampling event pursuant to the Notice provisions below.

6.      **"Action Memorandum" Trigger; CSPA Review of "Action Memorandum"; Meet-and-Confer.** If any sample taken during the term of this Consent Decree exceeds the levels set forth in Exhibit D, or if Defendant fails to collect and analyze samples from four (4) storm events during each annual wet season, as qualified in the General Permit, Defendant shall prepare a written statement discussing the exceedance(s) and/or why fewer than four (4) samples were collected and analyzed, the possible cause and/or source of the exceedance(s), and additional measures that will be taken to address and eliminate future exceedances ("Action Memorandum"). The Action Memorandum shall be provided to CSPA not later than July 15th following the conclusion of each wet season covered under this Consent Agreement. Actions proposed to address any identified exceedances may include structural, housekeeping, or other best management practices at the Facility. Such additional measures,

---

[1] "Qualifying Storm Events" under the General Permit are those events in which (i) the samples taken are preceded by at least three (3) working days during which no storm water discharges from the Facility have occurred; (ii) the samples are collected within the first hour that flow is observed at the Discharge Point being sampled; and (iii) the samples are collected during daylight operating hours.

to the extent reasonably feasible, shall be implemented within 60 days after the due date of the Action Memorandum. Within thirty (30) days of implementing any additional best management practices, the SWPPP shall be amended as required by the General Permit. CSPA may review and comment on an Action Memorandum and suggest alternative or additional pollution prevention measures it believes are appropriate; however, CSPA's failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum. Defendant shall not be obligated to perform any of the pollution prevention measures CSPA may suggest, but shall be required to implement pollution prevention measures to bring the Facility within compliance. Upon request by either Party, the Parties agree to meet and confer in good faith (at the Facility, if requested by either Party) regarding the Action Memorandum.

7. **Inspections During the Term of this Agreement.** In addition to any site inspections conducted as part of the meet-and-confer process concerning an Action Memorandum as set forth above, Defendant shall permit representatives of CSPA to perform up to three (3) physical inspections of the Facility during the term of this Consent Agreement. These inspections may be performed by CSPA's counsel and/or consultants and may include the receipt of split-samples of storm water discharges[2], photographing, and/or videotaping and CSPA shall provide Defendant with a copy of all sampling reports, photographs and/or video within a reasonable period of time after a site visit, not to exceed ten (10) business days for photographs and video, and no later than ten (10) business days after CSPA's receipt of any laboratory reports from split samples. CSPA shall provide at least three (3) business days advance notice of such physical inspection, except that Defendant shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals. In such case, Defendant shall specify at least three (3) dates within the two (2) weeks thereafter upon which a

---

[2] Any samples taken during such inspections shall be taken by Defendant under the supervision of representatives or agents of CSPA, including but not limited to CSPA's legal counsel and storm water consultant(s). The split shall be provided to CSPA at the time of sampling for independent testing and analysis. Unless otherwise required by the General Permit, samples taken during noticed inspections will not serve as substitute for the sampling requirements of Paragraph 4 of this Consent Agreement, and will in no way relieve Recology of its obligation to sample and analyze at least four (4) storm events pursuant to the requirements of Paragraph 4.

physical inspection by CSPA may proceed. Defendant shall provide CSPA with written documentation of any alterations to Facility conditions related to storm water discharges during the period between receiving CSPA's advance notice requesting an inspection and the start of CSPA's inspection. The documentation shall include the date the alterations related to storm water discharges were planned and/or scheduled, the date of the issuance of any purchase order and/or maintenance order, if any, for the alterations, and the date the alterations were implemented. Nothing herein shall be construed to prevent Defendants from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

      **8.**     **Defendant's Communications with Regional and State Boards.** During the term of this Consent Agreement, Defendant shall provide CSPA with copies of all documents submitted to the Regional Board or the State Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit. Such documents and reports shall be provided to CSPA pursuant to the Notice provisions herein (at ¶ 26) and contemporaneously with Defendant's submission to such agencies.

      **9.**     **SWPPP Amendments.** Defendant shall provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of the Consent Agreement within fourteen (14) days of such amendment.

## II.   MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS

      **10.**     As mitigation of the Clean Water Act violations alleged in CSPA's First Amended Complaint, and in lieu of any civil penalty assessment in connection with the alleged violations of the Clean Water Act, Defendant agrees to pay the sum of $75,000 within seven (7) business days after the Court Approval Date to the Rose Foundation for Communities and the Environment (6008 College Avenue, Oakland, CA 94618, Attn: Tim Little) for projects to improve water quality in the Feather River, the Sacramento River and/or the Sacramento-San Joaquin-San Francisco Bay-River Delta. In lieu of any civil penalty assessment against Defendant in connection with the alleged violations of Proposition 65 Defendant agrees to pay the additional sum of $20,000 to the Rose Foundation for

<div align="center">- 9 -</div>

Communities and the Environment within seven (7) business days after the Court Approval Date. These additional funds shall be used to reduce exposures to toxic chemicals, and to increase consumer, worker and community awareness of the health hazards posed by toxic chemicals consistent with the statutory goals of Proposition 65.

11.     Defendant agrees to reimburse CSPA in the amount of $51,506 to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating a resolution in the public interest.  Such payment shall be made to the Jackson & Tuerck Attorney-Client Trust Account within seven (7) business days after the Court Approval Date.  CSPA shall provide Defendant with a general accounting statement, showing the components of these expenses by entity/person and subject matter, no later then seven (7) business days after the Court Approval Date.  Such accounting shall not require the release of any information protected attorney-client privilege and/or the work product doctrine.

12.     **Compliance Monitoring Funding.**

        **a.** To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendant's compliance with this Consent Agreement, Defendant agree to contribute up to $5,000 for each of the three years covered by this Consent Agreement, to a compliance monitoring fund maintained by CSPA.  Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, discussions with representatives of Defendants concerning the Action Memoranda referenced above, and potential changes to compliance requirements herein, preparation for and participation in meet-and-confer sessions, water quality sampling and analysis, and compliance-related activities ("Compliance Expenditures").

        **b.** The first such payment in the amount of $5,000 shall be made payable to the Jackson & Tuerck Attorney-Client Trust Account within seven (7) business days of the Court Approval Date.  No later than August 15, 2011, CSPA shall provide Defendant with a general accounting statement of Compliance Expenditures incurred to-date, or reasonably expected to be incurred

- 10 -

on or before August 15, 2011. Such accounting shall not require the release of any information protected by attorney-client privilege and/or the work product doctrine. If the actual Compliance Expenditures incurred, or reasonably expected to be incurred on or before August 15, 2011 are less than $5,000, the difference between the actual amount incurred by CSPA and $5,000 shall be termed the "2011 Surplus."

    **c.** No later than August 30, 2011, Defendant shall pay $5,000, less the 2011 Surplus, if any, payable to the Jackson & Tuerck Attorney-Client Trust Account for CSPA Compliance Expenditures between August 15, 2011 and August 15, 2012.

    **d.** No later than August 15, 2012, CSPA shall provide Defendant with a general accounting statement of Compliance Expenditures incurred between August 15, 2011 and August 15, 2012, or reasonably expected to be incurred on or before August 15, 2012. Such accounting shall not require the release of any information protected by attorney-client privilege and/or the work product doctrine. If the actual Compliance Expenditures incurred, or reasonably expected to be incurred on or before August 15, 2012 are less than $5,000, the difference between the actual amount incurred by CSPA and $5,000 shall be termed the "2012 Surplus."

    **e.** No later than August 30, 2012, Defendant shall pay $5,000, less the 2012 Surplus, if any, payable to the Jackson & Tuerck Attorney-Client Trust Account for CSPA Compliance Expenditures between August 15, 2012 and August 15, 2013.

    **f.** No later than September 1, 2013, CSPA shall provide Defendant with a general accounting statement of Compliance Expenditures incurred between August 15, 2012 and September 1, 2013, or reasonably expected to be incurred on or before September 1, 2013. Such accounting shall not require the release of any information protected by attorney-client privilege and/or the work product doctrine. If the actual Compliance Expenditures incurred, or reasonably expected to be incurred on or before September 1, 2013, are less than the amount tendered to CSPA pursuant to Paragraph 12(e), CSPA shall, per Defendant's instructions, provide a check to Defendant refunding the difference, if any, no later than September 15, 2013.

### III.  IMPOSSIBILITY OF PERFORMANCE AND FORCE MAJEURE

13.    Where implementation of the actions set forth in this Consent Agreement becomes impossible within the deadlines set forth in those paragraphs, despite the timely good faith efforts of the Parties, the party who is unable to comply shall notify the other in writing within seven (7) business days of the date that the failure becomes apparent, and shall describe the reason for the non-performance.  The Parties agree to meet and confer in good faith concerning the non-performance pursuant to Section IV and, where the Parties concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the Parties, new performance deadlines shall be established.  In the event that the Parties cannot timely agree upon the terms of such a stipulation, either Party shall have the right to seek enforcement of this agreement as provided in Paragraph 15.

14.    No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any circumstances beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority.  A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm event, or inability to pay.  Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

### IV.  DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT

15.    With the exception of the timelines set forth above for addressing exceedances of values specified on Exhibit D and Action Memoranda, if a dispute under this Consent Agreement arises, or either Party believes that a breach of this Consent Decree has occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under

- 12 -

the law, including filing a motion with the District Court of California, Eastern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Agreement. The Parties shall be entitled to seek fees and costs pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

16. **CSPA Waiver and Release.** Upon Court approval and entry of this Consent Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendant and its officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of their predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this Action, for the alleged failure of Defendant to comply with the Clean Water Act and Proposition 65 at the Facility, up to the Court Approval Date. During the term of the Consent Agreement, CSPA agrees that neither CSPA, its officers, executive staff, or members of its governing board, nor any organization under the control of CSPA, will file or support any lawsuit against Defendant seeking relief for alleged violations of the Clean Water Act, the General Permit, or Proposition 65.

17. **Defendant's Waiver and Release.** Defendant, on their own behalf and on behalf of those Released Defendant Parties under its control, releases CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

18. Upon the Court Approval Date, the Parties shall file with the Court a Stipulation and

- 13 -

[PROPOSED] CONSENT AGREEMENT

Order that shall provide that:

        a.    the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and

        b.    the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement. Nothing in this Consent Agreement shall be construed as a waiver of any party's right to appeal from an order that arises from an action to enforce the terms of this Consent Agreement.

## V.   NO ADMISSION

    **19.**    The Parties enter into this Consent Agreement for the purpose of avoiding prolonged and costly litigation. Nothing in this Consent Agreement shall be construed as, and Defendant expressly does not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement constitute or be construed as an admission by Defendant of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Agreement.

## VI.   MISCELLANEOUS PROVISIONS

    **20.**    The Consent Agreement shall terminate on September 30, 2013.

    **21.**    The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Consent Agreement shall be valid as an original.

    **22.**    In the event that any of the provisions of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

    **23.**    The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Consent Agreement shall be construed pursuant to California law, without regarding to conflict of law principles.

    **24.**    The undersigned are authorized to execute this Consent Agreement on behalf of their respective parties and have read, understood and agreed to be bound by all of the terms and conditions

of this Consent Agreement.

25.     All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein. This Consent Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Stipulated Judgment, unless otherwise expressly provided for therein.

26.     **Notices.** Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to CSPA pursuant to this Consent Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Bill Jennings, Executive Director
> California Sportfishing Protection Alliance
> 3536 Rainier Avenue
> Stockton, CA 95204
> E-mail: DeltaKeep@aol.com

> With copies sent to:

> Robert J. Tuerck, Esq.
> Jackson & Tuerck
> P.O. Box 148
> 429 W. Main Street, Suite C
> Quincy, CA 95971
> Tel: (530) 283-0406
> Fax: (530) 283-0416
> E-mail: Bob@JacksonTuerck.com

> And to:

> Andrew L. Packard
> Law Offices of Andrew L. Packard
> 100 Petaluma Boulevard North, Suite 301
> Petaluma, CA 94952
> Tel: (707) 763-7227
> E-mail: Andrew@packardlawoffices.com

Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to Defendants pursuant to this Consent Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

- 15 -

Mr. Joe Matz
Vice President/General Manager
Recology Butte Colusa Counties
2720 S. Fifth Ave. Oroville, CA 95965
Tel: (530) 533-4783
Fax: (530) 534-9529
E-mail: jmatz@recology.com

And to:

Mr. Drew Lehman
Director, Environment & Planning
Recology
50 California Street
San Francisco, CA
Tel: (415) 875-1173
Fax: (415) 875-1154
E-mail: dlehman@recology.com

With copies sent to:

Mr. J. Tom Boer
Barg Coffin Lewis & Trapp, LLP
350 California Street, 22nd Floor
San Francisco, CA 94104-1435
Tel: (415) 228-5400
Fax.: (415) 228-5450
E-mail: jtb@bcltlaw.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

27. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

28. If for any reason the Court should decline to approve this Consent Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Consent Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall become null and void.

29. This Consent Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

30. This Consent Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and

- 16 -

communications of the Parties, whether oral or written, respecting the matters covered by this Consent Agreement. This Consent Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives, and then by order of the Court.

31. Except in case of an emergency but subject to the regulatory authority of any applicable governmental authority, any breach of or default under this Consent Agreement capable of being cured shall be deemed cured if, within five (5) business days of first receiving notice of the alleged breach or default, or within such other period approved in writing by the Party making such allegation, which approval shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure or, if the breach or default can be cured but is not capable of being cured within such five (5) business day period, has commenced and is diligently pursuing to completion such cure.

The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for its approval and entry as an Order and Final Judgment.

Dated: 12-23-2010          California Sportfishing Protection Alliance

By: _____

Bill Jennings, Executive Director

Dated: 12-23-10          Recology of Butte Colusa Counties

By: _____

Signature

GEORGE P. McGRATH
EXECUTIVE VICE PRESIDENT / COO
Name/Title
Recology Butte Colusa Counties

- 17 -

[PROPOSED] CONSENT AGREEMENT

**EXHIBIT A -- Facility Site Map**



**LEGEND**

- APPROXIMATE SITE BOUNDARY
- STORMWATER FLOW DIRECTION
- IMPERVIOUS AREAS
- DROP INLET LOCATION
- STORM DRAIN; DIRECTION OF DRAINAGE
- STORM WATER SAMPLE LOCATION
- CHECK DAM LOCATION

**LOCATIONS:**

1. MRF/TRANSFER STATION
2. COMPANY VEHICLE UNLOADING AREA
3. PUBLIC REFUSE UNLOADING AREA
4. OFFICE
5. BALED COMMODITY STORAGE BUILDING
6. MAINTENANCE SHOP
7. PUBLIC PARKING AREA
8. EMPLOYEE PARKING AREA
9. VEHICLE PARKING AREA
10. STEAM CLEANER
11. COMPRESSOR
12. APPLIANCE STORAGE AND PROCESSING AREA
13. BIN STORAGE AREA
14. SCRAP METAL STORAGE AREA
15. PROPANE TANK (500 gal.)
16. TOTER ASSEMBLY
17. SCALE
18. COVERED WASH PAD/OIL-WATER SEPERATOR
19. TANKER TRUCK UNLOADING AREA
20. 12,000 GAL. DIESEL FUEL AST
21. DISPENSING STATION
22. SMALL AST AND DRUM STORAGE
23. CONSTRUCTION AND DEMOLITION WASTE UNLOADING AND SORTING AREA
24. PROHIBITED WASTE TEMPORARY STORAGE BIN
25. GREEN WASTE UNLOADING AREA
26. 275 GAL. USED OIL TANK
27. HOUSEHOLD HAZARDOUS WASTE FACILITY
28. PUBLIC HHW UNLOADING AREA (COVERED)
29. PUBLIC BUY-BACK AREA (COVERED)
30. K-RAILS WITH CURB
31. LANDSCAPE
32. ROCK SWALE AND CATCH BASIN WITH WATTLES
33. AREA WHERE PONDING OCCURS

SITE PLAN BASE: CSW ENGINEERING, SANTA ROSA, CA; SITE PLAN, SEPTEMBER, 2008. ALL LOCATIONS ARE APPROXIMATE, NOT A PRODUCT OF SURVEY.

| NO. | REVISION | DATE |
|---|---|---|
| | | |

SHEET TITLE: SWPPP MAP

PROJECT TITLE: RECOLOGY - BUTTE COUNTY, 2720 SOUTH FIFTH AVENUE, OROVILLE, CALIFORNIA

Recology Butte Colusa Counties

SCS ENGINEERS
ENVIRONMENTAL CONSULTANTS

DATE: 11/10/10
SCALE: 1" = 80'
FIGURE 1

**EXHIBIT B – CSPA 60-Day Clean Water Act Notice Letter**



**California Sportfishing Protection Alliance**
*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

March 17, 2010

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Joe Matz, General Manager
Recology Butte Colusa Counties
fka NorCal Waste Systems of Butte Co.
2720 S. Fifth Avenue
Oroville, CA 95965

Mr. Joe Matz, General Manager
Recology Butte Colusa Counties
fka NorCal Waste Systems of Butte Co.
P.O. Box 1512
Oroville, CA 95965

Roxanne L. Frye, Agent for Service for
Recology Butte Colusa Counties
50 California St., 24th Floor
San Francisco CA 94111

**Re:** **Notice of Violations and Intent to File Suit Under the Federal Water
Pollution Control Act**

Dear Sir and Madam:

I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the
Oroville transfer station facility located at 2720 S. Fifth Avenue, Oroville, CA 95965
("the Facility"), which is owned and/or operated by Recology Butte Colusa Counties
("Recology"), formerly known as NorCal Waste Systems of Butte Co. ("NorCal") until
the formal name change was announced on April 27, 2009. For purposes of this Notice
of Violations and Intent to File Suit under the Act (hereafter, the "Notice"), unless
otherwise noted, CSPA will refer to NorCal and Recology as Recology within this
Notice. The WDID identification number for the Facility is 5R041001553. CSPA is a
non-profit public benefit corporation dedicated to the preservation, protection, and
defense of the environment, wildlife and natural resources of the Sacramento River, its
tributaries, and other California waters. This letter is being sent to you as the responsible
owners, officers, or operators of the Recology Butte Colusa Counties' Oroville Transfer
Station.

This letter addresses Recology's unlawful discharges of pollutants from the
Facility directly, and indirectly via the storm water conveyance system for the City of
Oroville, into the Feather River, which is a tributary to the Sacramento River and the
Sacramento-San Joaquin Delta. This letter addresses the ongoing violations of the
substantive and procedural requirements of the Clean Water Act and National Pollutant
Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water

Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("General Industrial Storm Water Permit" or "General Permit").

CSPA is particularly concerned about these ongoing unlawful discharges because Recology has been repeatedly warned by the Regional Water Quality Control Board that storm water runoff from the facility exceeds US EPA benchmark values for common storm water pollutants, and that the General Permit requires discharges to implement best management practices (BMPs) using best available pollutant control technology (BAT) and best available pollutant control technology (BCT) to reduce or eliminate the discharge of pollutants.[1] It is CSPA's intention, through this letter, to bring these violations to Recology's attention so that they may be resolved in a comprehensive and efficient manner.

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Recology is hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Recology under Section 505(a) of the Clean Water Act (33 USC § 1365(a)), for violations of the Clean Water Act and the General Industrial Storm Water Permit. These violations are described more fully below.

I.      **Background.**

Recology submitted a notice of intent to comply with the terms of the General Industrial Storm Water Permit. The Facility is primarily used to dispose of municipal solid waste; other current activities at the Facility include recycling, and the use, storage, and maintenance of motorized vehicles, including trucks used to haul materials to and from the Facility. Accordingly, the Facility is classified as a landfill facility under Standard Industrial Classification ("SIC") code 4953, as a scrap recycling facility under SIC code 5093, and as a motor freight transportation and warehousing facility under SIC code 4212. Recology is not a member of any monitoring group. The Facility collects and discharges storm water from its roughly 13-acre industrial site through at least three

---

[1] CSPA is aware of at least five letters from the California Regional Water Quality Control Board, Central Valley Region, sent to NorCal on August 13 2001; August 12, 2002; May 18, 2007; May 22, 2007; and December 15, 2009; advising NorCal of benchmark exceedances in its storm water discharges and the need for the employment of BMPs and BCTs.

Notice of Violation and Intent To File Suit
March 17, 2010
Page 3 of 17

discharge points to storm water drains which drain to the Feather River and, ultimately, to the Delta.

The Central Valley Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for the Sacramento River and the Delta in the "Water Quality Control Plan for the Sacramento River and San Joaquin River Basins," generally referred to as the Basin Plan. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." For the Delta, the Basin Plan establishes standards for several metals, including (at a hardness of 40 mg/L) 0.01 mg/L for arsenic, 0.1 mg/L for copper, 0.3 mg/L for iron, and 0.1 mg/L for zinc. $Id.$ at III-4.00. The Basin Plan states that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/L." $Id.$ at III-3.00. The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." $Id.$ at III-6.00. The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses." $Id.$ at III-5.00

The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)." $Id.$, at III-3.0. The EPA has issued a recommended water quality criteria for aluminum for freshwater aquatic life protection of 0.087 mg/L. EPA has established a secondary MCL, consumer acceptance limit for aluminum of 0.05 mg/L to 0.2 mg/L. EPA has established a secondary MCL, consumer acceptance limit for the following: zinc – 5.0 mg/L; copper – 1.0 mg/L; and iron – 0.3 mg/L. EPA has established a primary MCL, consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L; and lead – 0.0 (zero) mg/L. *See* http://www.epa.gov/safewater/ mcl.html. The California Department of Health Services has also established the following MCL, consumer acceptance levels: aluminum – 1.0 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L. *See* California Code of Regulations, title 22, §§ 64431, 64449.

The EPA has also issued numeric receiving water limits for certain toxic pollutants in California surface waters, commonly known as the California Toxics Rule ("CTR"). 40 CFR §131.38. The CTR establishes the following numeric limits for freshwater surface waters: arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides, and mercury. *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf. Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures. *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Industrial Storm Water Permit also incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Recology: pH – 6.0-9.0; total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; chemical oxygen demand – 120 mg/L; aluminum – 0.75 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L; lead – 0.0816 mg/L; and zinc – 0.117 mg/L. The State Water Quality Control Board also proposed adding a benchmark level for specific conductance of 200 μmho/cm.

## II. Pollutant Discharges in Violation of the NPDES Permit.

Recology has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Industrial Storm Water Permit. Discharge Prohibition A(1) of the General Industrial Storm Water Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

The General Permit further prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD") and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Based on its review of available public documents, CSPA is informed and believes that Recology failed to comply with the requirements of the General Permit and has continued to operate in violation of the General Permit despite the Regional Board's repeated warnings and notices of violation issued to Recology. Recology's ongoing violations are discussed further below.

### A. Recology Has Discharged Storm Water Containing Pollutants in Violation of the Permit.

Recology has discharged and continues to discharge stormwater with unacceptable levels of pH, total suspended solids, specific conductivity, oil and grease, chemical oxygen demand, aluminum, copper, iron, lead, and zinc in violation of the General Industrial Storm Water Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto. Recology's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than stormwater and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Recology Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

### 1. Discharges of Storm Water Containing pH levels in Excess of EPA Multi-Sector Benchmark Values.

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 10/16/2007 | Outfall B | pH | 5.86 | 6.0-9.0 |

Notice of Violation and Intent To File Suit
March 17, 2010
Page 6 of 17

2. **Discharges of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 03/23/2005 | Outfall B | TSS | 900 mg/L | 100 mg/L |
| 03/23/2005 | Outfall C | TSS | 500 mg/L | 100 mg/L |
| 11/29/2005 | Outfall B | TSS | 940 mg/L | 100 mg/L |
| 03/03/2006 | Outfall C | TSS | 570 mg/L | 100 mg/L |
| 03/03/2006 | Outfall B | TSS | 1100 mg/L | 100 mg/L |
| 04/11/2006 | Outfall C | TSS | 320 mg/L | 100 mg/L |
| 02/09/2002 | Outfall B | TSS | 240 mg/L | 100 mg/L |
| 02/09/2002 | Outfall C | TSS | 120 mg/L | 100 mg/L |
| 03/26/2007 | Outfall B | TSS | 230 mg/L | 100 mg/L |
| 03/26/2007 | Outfall C | TSS | 820 mg/L | 100 mg/L |
| 10/16/2007 | Outfall B | TSS | 710 mg/L | 100 mg/L |
| 12/04/2007 | Outfall B | TSS | 460 mg/L | 100 mg/L |
| 12/04/2007 | Outfall C | TSS | 180 mg/L | 100 mg/L |

3. **Discharges of Storm Water Containing Specific Conductivity (SC) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 03/23/2005 | Outfall B | SC | 830 µmho/cm | 200 µmho/cm |
| 03/23/2005 | Outfall C | SC | 310 µmho/cm | 200 µmho/cm |
| 11/29/2005 | Outfall B | SC | 370 µmho/cm | 200 µmho/cm |
| 03/03/2006 | Outfall B | SC | 320 µmho/cm | 200 µmho/cm |
| 02/09/2002 | Outfall B | SC | 1500 µmho/cm | 200 µmho/cm |
| 02/09/2002 | Outfall C | SC | 300 µmho/cm | 200 µmho/cm |
| 03/26/2007 | Outfall B | SC | 1000 µmho/cm | 200 µmho/cm |
| 03/26/2007 | Outfall C | SC | 240 µmho/cm | 200 µmho/cm |
| 10/16/2007 | Outfall B | SC | 2900 µmho/cm | 200 µmho/cm |
| 12/04/2007 | Outfall B | SC | 780 µmho/cm | 200 µmho/cm |
| 12/04/2007 | Outfall C | SC | 220 µmho/cm | 200 µmho/cm |

Notice of Violation and Intent To File Suit
March 17, 2010
Page 7 of 17

4.    **Discharges of Storm Water Containing Oil & Grease (O&G) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 03/03/2005 | Outfall B | O&G | 19 mg/L | 15 mg/L |
| 03/26/2007 | Outfall B | O&G | 81 mg/L | 15 mg/L |
| 03/26/2007 | Outfall C | O&G | 19 mg/L | 15 mg/L |
| 10/16/2007 | Outfall B | O&G | 120 mg/L | 15 mg/L |
| 12/04/2007 | Outfall C | O&G | 140 mg/L | 15 mg/L |

5.    **Discharges of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 03/23/2005 | Outfall B | COD | 240 mg/L | 120 mg/L |
| 03/23/2005 | Outfall C | COD | 210 mg/L | 120 mg/L |
| 11/29/2005 | Outfall B | COD | 350 mg/L | 120 mg/L |
| 03/03/2006 | Outfall B | COD | 160 mg/L | 120 mg/L |
| 02/09/2002 | Outfall B | COD | 3,400 mg/L | 120 mg/L |
| 02/09/2002 | Outfall C | COD | 620 mg/L | 120 mg/L |
| 03/26/2007 | Outfall B | COD | 3,100 mg/L | 120 mg/L |
| 03/26/2007 | Outfall C | COD | 550 mg/L | 120 mg/L |
| 10/16/2007 | Outfall B | COD | 10,000 mg/L | 120 mg/L |
| 12/04/2007 | Outfall B | COD | 3,600 mg/L | 120 mg/L |
| 12/04/2007 | Outfall C | COD | 260 mg/L | 120 mg/L |

6.    **Discharges of Storm Water Containing Aluminum (Al) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 03/23/2005 | Outfall B | Al | 6.8 mg/L | 0.75 mg/L |
| 03/23/2005 | Outfall C | Al | 3.4 mg/L | 0.75 mg/L |
| 11/29/2005 | Outfall B | Al | 8.3 mg/L | 0.75 mg/L |
| 03/03/2006 | Outfall C | Al | 26 mg/L | 0.75 mg/L |
| 03/03/2006 | Outfall B | Al | 42 mg/L | 0.75 mg/L |
| 04/11/2006 | Outfall C | Al | 11 mg/L | 0.75 mg/L |

Notice of Violation and Intent To File Suit
March 17, 2010
Page 8 of 17

| 02/09/2002 | Outfall B | Al | 5.2 mg/L | 0.75 mg/L |
|---|---|---|---|---|
| 02/09/2002 | Outfall C | Al | 4.4 mg/L | 0.75 mg/L |
| 03/26/2007 | Outfall B | Al | 27 mg/L | 0.75 mg/L |
| 03/26/2007 | Outfall C | Al | 9.5 mg/L | 0.75 mg/L |
| 10/16/2007 | Outfall B | Al | 7 mg/L | 0.75 mg/L |
| 12/04/2007 | Outfall B | Al | 3.6 mg/L | 0.75 mg/L |
| 12/04/2007 | Outfall C | Al | 1.7 mg/L | 0.75 mg/L |

7.  **Discharges of Storm Water Containing Copper (Cu) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 03/23/2005 | Outfall B | Cu | 0.140 mg/L | 0.0636 mg/L |
| 03/23/2005 | Outfall C | Cu | 0.082 mg/L | 0.0636 mg/L |
| 11/29/2005 | Outfall B | Cu | 0.120 mg/L | 0.0636 mg/L |
| 03/03/2006 | Outfall C | Cu | 0.098 mg/L | 0.0636 mg/L |
| 03/03/2006 | Outfall B | Cu | 0.210 mg/L | 0.0636 mg/L |
| 04/11/2006 | Outfall C | Cu | 0.082 mg/L | 0.0636 mg/L |
| 02/09/2002 | Outfall B | Cu | 0.100 mg/L | 0.0636 mg/L |
| 03/26/2007 | Outfall B | Cu | 0.490 mg/L | 0.0636 mg/L |
| 03/26/2007 | Outfall C | Cu | 0.079 mg/L | 0.0636 mg/L |
| 10/16/2007 | Outfall B | Cu | 0.480 mg/L | 0.0636 mg/L |
| 12/04/2007 | Outfall B | Cu | 0.130 mg/L | 0.0636 mg/L |

8.  **Discharges of Storm Water Containing Iron (Fe) at Concentrations in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 03/23/2005 | Outfall B | Fe | 12 mg/L | 1.0 mg/L |
| 03/23/2005 | Outfall C | Fe | 5.4 mg/L | 1.0 mg/L |
| 11/29/2005 | Outfall B | Fe | 12 mg/L | 1.0 mg/L |
| 03/03/2006 | Outfall C | Fe | 33 mg/L | 1.0 mg/L |
| 03/03/2006 | Outfall B | Fe | 57 mg/L | 1.0 mg/L |
| 04/11/2006 | Outfall C | Fe | 19 mg/L | 1.0 mg/L |
| 02/09/2002 | Outfall B | Fe | 7.8 mg/L | 1.0 mg/L |
| 02/09/2002 | Outfall C | Fe | 6 mg/L | 1.0 mg/L |
| 03/26/2007 | Outfall B | Fe | 37 mg/L | 1.0 mg/L |
| 03/26/2007 | Outfall C | Fe | 13 mg/L | 1.0 mg/L |
| 10/16/2007 | Outfall B | Fe | 16 mg/L | 1.0 mg/L |

Notice of Violation and Intent To File Suit
March 17, 2010
Page 9 of 17

| 12/04/2007 | Outfall B | Fe | 6.2 mg/L | 1.0 mg/L |
| 12/04/2007 | Outfall C | Fe | 2.5 mg/L | 1.0 mg/L |

9. **Discharges of Storm Water Containing Lead (Pb) at Levels in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 03/23/2005 | Outfall B | Pb | 0.13 mg/L | 0.0816 mg/L |
| 11/29/2005 | Outfall B | Pb | 0.14 mg/L | 0.0816 mg/L |
| 03/03/2006 | Outfall B | Pb | 0.18 mg/L | 0.0816 mg/L |
| 03/26/2007 | Outfall B | Pb | 0.32 mg/L | 0.0816 mg/L |
| 10/16/2007 | Outfall B | Pb | 0.27 mg/L | 0.0816 mg/L |

10. **Discharges of Storm Water Containing Zinc (Zn) at Levels in Excess of EPA Multi-Sector Benchmark Values.**

| Date | Outfall | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|---------|-----------|----------------------------|---------------------|
| 03/23/2005 | Outfall B | Zn | 0.70 mg/L | 0.117 mg/L |
| 03/23/2005 | Outfall C | Zn | 0.33 mg/L | 0.117 mg/L |
| 11/29/2005 | Outfall B | Zn | 0.90 mg/L | 0.117 mg/L |
| 03/03/2006 | Outfall C | Zn | 0.40 mg/L | 0.117 mg/L |
| 03/03/2006 | Outfall B | Zn | 1.10 mg/L | 0.117 mg/L |
| 04/11/2006 | Outfall C | Zn | 1.30 mg/L | 0.117 mg/L |
| 02/09/2002 | Outfall B | Zn | 0.64 mg/L | 0.117 mg/L |
| 02/09/2002 | Outfall C | Zn | 0.24 mg/L | 0.117 mg/L |
| 03/26/2007 | Outfall B | Zn | 2.30 mg/L | 0.117 mg/L |
| 03/26/2007 | Outfall C | Zn | 0.56 mg/L | 0.117 mg/L |
| 12/04/2007 | Outfall B | Zn | 0.76 mg/L | 0.117 mg/L |
| 12/04/2007 | Outfall C | Zn | 0.18 mg/L | 0.117 mg/L |

CSPA's investigation, including its review of Recology's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the Basin Plan's benchmark for pH, indicates that Recology has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids TSS, Copper (Cu), Aluminum (Al), Iron (Fe), Lead (Pb), Zinc (Zn), Oil and Grease (O&G) and unacceptable levels of pH, Chemical Oxygen Demand (COD), and other pollutants. Recology was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Recology is discharging

polluted storm water associated with its industrial operations in violation of the General Permit without having implemented BAT and BCT.

CSPA is informed and believes that Recology has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least March 17, 2005. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since March 17, 2005, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Recology has discharged storm water containing impermissible levels of pH, total suspended solids, specific conductivity, oil and grease, chemical oxygen demand, aluminum, copper, iron, lead, and zinc in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of stormwater containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Recology is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since March 17, 2005.

**B.      Recology Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations. Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board. Section B(5)(a) of the General Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Facilities, such as Recology, designated under SIC 4212, 4953, and 5093 are also required to sample for chemical oxygen demand, aluminum, copper, iron, lead, and zinc. Section B(5)(c)(ii) of the General Permit requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

Based on its investigation, CSPA is informed and believes that Recology has failed to develop and implement an adequate Monitoring & Reporting Plan. First, Recology has failed to collect storm water samples from each discharge point during at least two qualifying storm events (as defined by the General Permit) during each of the past five years. Second, Recology has failed to analyze its storm water for all pollutants likely to be present in significant quantities in its storm water discharge. Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Recology is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since March 17, 2005. These violations are set forth in greater detail below.

1.  **Recology Has Failed to Collect at Least Two Storm Water Samples From Each Facility Discharge Point During Each of the Last Five Years.**

Based on its review of publicly available documents, CSPA is informed and believes that Recology has failed to collect storm water samples from all discharge points at the Facility for at least two storm events during each Wet Season as required by Section B(5)(a). For example, Recology has collected and analyzed only one sample from "Outfall A" during the last five years. Recology also failed to collect and analyze a sample from "Outfall C' for the first storm event of the 2007-2008 Wet Season. Moreover, Recology failed to report the collection and analysis of any storm water samples during the 2008-2009 Wet Season. Recology's failure to comply with the sampling requirements of the ACT and the Permit constitute separate and ongoing violations of the Permit and the Act.

Based on CSPA's review of publicly available rainfall data from this region and a review of the historic rainfall monitoring station data, the assertion that there were no qualifying storm events during any the wet seasons over the past five years quite simply strains credulity. Recology's 2007-2008 Annual Report indicates that there were no qualifying storm events between January and May of 2008, and there were no storm events that produced a discharge from Outfall A. Similarly, Recology's 2007-2008 Annual Report states that no qualifying rainfall events during October, November, December, January, and May of the 2006-2007 wet season. Again, based on publicly available rainfall data from this region and a review of the historic rainfall monitoring station data, the assertion that there were no qualifying storm events during any wet season over the past five years is very difficult to believe.

2.  **Recology Has Failed to Analyze Its Storm Water for All Pollutants Likely to Be Present in Significant Quantities in Its Storm Water Discharge.**

Section B(5)(c)(ii) of the General Permit requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." Based on a review of Recology's Annual Reports submitted to the Regional Board, CSPA believes during the 2005-2006 Wet Season Recology has failed to monitor for at least six pollutants likely to be present in storm water discharges in significant quantities – arsenic, chromium, manganese, mercury, nickel, and nitrate+nitrite. CSPA further believes that Recology has failed to collect and analyze zinc, as required for industries falling under Standard Industrial Classification 5093, during the 2007-2008 Wet Season. Each failure to monitor for each separate parameter constitutes a separate violation of the General Industrial Storm Water Permit and the Act. The Facility's failure to monitor these mandatory parameters has caused and continues to cause multiple separate and ongoing violations of the General Permit and Act.

**3.** **Recology Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since March 17, 2005.**

CSPA is informed and believes that available documents demonstrate Recology's consistent and ongoing failure to implement an adequate Monitoring & Reporting Plan in violation of Section B of the General Industrial Storm Water Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Recology is subject to penalties for these violations of the General Industrial Storm Water Permit and the Act since March 17, 2005.

**C.** **Recology Has Failed to Implement BAT and BCT.**

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). CSPA's investigation indicates that Recology has not implemented BAT and BCT at the Facility for its discharges of pH, total suspended solids, specific conductivity, oil and grease, chemical oxygen demand, aluminum, copper, iron, lead, zinc and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

On May 18 and May 23, 2007, and again on December 15, 2009, an agent from the Storm Water and Water Certification Unit of the Regional Board sent letters to Recology warning it that U.S. EPA benchmarks had been exceeded at the facility. The Regional Board noted that the "storm water samples indicate that the current BMPs implemented at the site are not sufficient to reduce pollutant concentrations below benchmark levels." The Regional Board ordered that additional BMPs must be implemented to reduce or eliminate the discharge of pollutants from the site. The Board

further ordered Recology to modify its existing Storm Water Pollution Prevention Plan ("SWPPP"). Based on available documents, CSPA is informed and believes that Recology failed to implement any additional BMPs and/or to inform the Regional Board of any such improvements or revisions to the SWPPP.

To meet the BAT/BCT requirement of the General Permit, Recology must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility. Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Recology must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether. Recology has failed to implement such measures adequately.

Recology was required to have implemented BAT and BCT by no later than October 1, 1992. Therefore, Recology has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that Recology fails to implement BAT and BCT. Recology is subject to penalties for violations of the Order and the Act occurring since March 17, 2005.

**D.      Recology Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate SWPPP no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby waterbodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General

Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of available documents regarding conditions at the Facility indicate that Recology has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Recology has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Recology has been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that Recology fails to develop and implement an effective SWPPP. Recology is subject to penalties for violations of the Order and the Act occurring since March 17, 2005.

**E.      Recology Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Recology is discharging elevated levels of pH, total suspended solids, specific conductivity, oil and grease, chemical oxygen demand, aluminum, copper, iron, lead and zinc that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutants, Recology was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards. Recology has failed to do so.

Based on CSPA's review of available documents, Recology was aware of high levels of these pollutants prior to March 17, 2005. Likewise, Recology has not filed any reports describing its noncompliance with the General Industrial Storm Water Permit in violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). Recology has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since March 17, 2005, and will continue to be in violation every day that Recology fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Recology is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since March 17, 2005.

F.    **Recology Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Recology has signed and submitted incomplete Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance at the Facility. As indicated above, Recology has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, Recology has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Recology submitted an incomplete, untimely, or incorrect annual report, that falsely certified compliance with the Act in the past years. Likewise, Recology's failure to submit any annual report for the 2008-2009 wet season is also a violation of the Permit. Recology's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act. Recology is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since March 17, 2005.

Notice of Violation and Intent To File Suit
March 17, 2010
Page 16 of 17

### III.     Persons Responsible for the Violations.

CSPA puts Mr. Joe Matz and Recology on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Recology on notice that it intends to include those persons in this action.

### IV.     Name and Address of Noticing Party.

Our name, address and telephone number is as follows: California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

### V.     Counsel.

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

Robert J. Tuerck
Jackson & Tuerck
429 Main Street, Suite C
P.O. Box 148
Quincy, CA 95971
Tel: (530) 283-0406
Fax: (530) 283-0416
E-mail: Bob@jacksontuerck.com

Andrew L. Packard
Law Offices of Andrew L. Packard
100 Petaluma Boulevard, Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@PackardLawOffices.com

### VI.     Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Mr. Joe Matz, and Recology to civil penalties of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Recology and its agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be

Notice of Violation and Intent To File Suit
March 17, 2010
Page 17 of 17

completed before the end of the 60-day notice period. We do not intend to delay the
filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

### SERVICE LIST

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

Roxanne L. Frye, Agent for Service for
Recology Butte Colusa Counties
50 California St., 24th Floor
San Francisco CA 94111

Mr. Joe Matz, General Manager
Recology Butte Colusa Counties
fka NorCal Waste Systems of Butte Co.
2720 S. Fifth Avenue
Oroville, CA 95965

Mr. Joe Matz, General Manager
Recology Butte Colusa Counties
fka NorCal Waste Systems of Butte Co.
P.O. Box 1512
Oroville, CA 95965

**ATTACHMENT A**
**Notice of Intent to File Suit, Recology Construction Products, Inc.**
**Significant Rain Events, March 17, 2005 – March 17, 2010**

| | | |
|---|---|---|
| March 19, 2005 | January 7, 2006 | December 8, 2006 |
| March 20, 2005 | January 11, 2006 | December 9, 2006 |
| March 21, 2005 | January 14, 2006 | December 10, 2006 |
| March 22, 2005 | January 17, 2006 | December 12, 2006 |
| March 27, 2005 | January 28, 2006 | December 13, 2006 |
| April 3, 2005 | February 4, 2006 | December 15, 2006 |
| April 7, 2005 | February 26, 2006 | December 21, 2006 |
| April 8, 2005 | February 27, 2006 | December 26, 2006 |
| May 4, 2005 | March 2, 2006 | December 27, 2006 |
| May 5, 2005 | March 3, 2006 | February 7, 2007 |
| May 8, 2005 | March 5, 2006 | February 8, 2007 |
| May 16, 2005 | March 6, 2006 | February 9, 2007 |
| May 17, 2005 | March 7, 2006 | February 10, 2007 |
| May 18, 2005 | March 9, 2006 | February 11, 2007 |
| May 19, 2005 | March 10, 2006 | February 12, 2007 |
| June 8, 2005 | March 14, 2006 | February 22, 2007 |
| June 16, 2005 | March 16, 2006 | February 24, 2007 |
| June 17, 2005 | March 17, 2006 | February 26, 2007 |
| October 3, 2005 | March 20, 2006 | March 26, 2007 |
| October 15, 2005 | March 21, 2006 | April 11, 2007 |
| October 26, 2005 | March 24, 2006 | April 14, 2007 |
| October 28, 2005 | March 25, 2006 | April 21, 2007 |
| November 3, 2005 | March 27, 2006 | April 22, 2007 |
| November 7, 2005 | March 28, 2006 | May 1, 2007 |
| November 8, 2005 | March 30, 2006 | May 2, 2007 |
| November 25, 2005 | March 31, 2006 | May 4, 2007 |
| November 29, 2005 | April 2, 2006 | June 5, 2007 |
| November 30, 2005 | April 3, 2006 | July 18, 2007 |
| December 1, 2005 | April 4, 2006 | September 22, 2007 |
| December 18, 2005 | April 7, 2006 | September 23, 2007 |
| December 20, 2005 | April 10, 2006 | September 28, 2007 |
| December 21, 2005 | April 11, 2006 | October 5, 2007 |
| December 22, 2005 | April 16, 2006 | October 10, 2007 |
| December 25, 2005 | April 22, 2006 | October 16, 2007 |
| December 27, 2005 | October 5, 2006 | October 19, 2007 |
| December 28, 2005 | November 2, 2006 | November 10, 2007 |
| December 29, 2005 | November 11, 2006 | November 11, 2007 |
| December 30, 2005 | November 13, 2006 | December 3, 2007 |
| December 31, 2005 | November 14, 2006 | December 4, 2007 |
| January 1, 2006 | November 16, 2006 | December 6, 2007 |
| January 3, 2006 | November 26, 2006 | December 7, 2007 |

**ATTACHMENT A**
**Notice of Intent to File Suit, Recology Construction Products, Inc.**
**Significant Rain Events, March 17, 2005 – March 17, 2010**

| | | |
|---|---|---|
| December 16, 2007 | December 24, 2008 | November 17, 2009 |
| December 17, 2007 | December 25, 2008 | November 20, 2009 |
| December 19, 2007 | January 2, 2009 | November 27, 2009 |
| December 20, 2007 | January 22, 2009 | December 11, 2009 |
| December 28, 2007 | January 23, 2009 | December 12, 2009 |
| December 29, 2007 | January 24, 2009 | December 13, 2009 |
| January 3, 2008 | January 25, 2009 | December 16, 2009 |
| January 4, 2008 | February 6, 2009 | December 20, 2009 |
| January 5, 2008 | February 8, 2009 | December 21, 2009 |
| January 6, 2008 | February 9, 2009 | December 27, 2009 |
| January 8, 2008 | February 10, 2009 | December 29, 2009 |
| January 10, 2008 | February 11, 2009 | December 30, 2009 |
| January 12, 2008 | February 12, 2009 | January 1, 2010 |
| January 21, 2008 | February 13, 2009 | January 12, 2010 |
| January 24, 2008 | February 15, 2009 | January 13, 2010 |
| January 25, 2008 | February 16, 2009 | January 17, 2010 |
| January 26, 2008 | February 17, 2009 | January 18, 2010 |
| January 27, 2008 | February 18, 2009 | January 19, 2010 |
| January 31, 2008 | February 22, 2009 | January 20, 2010 |
| February 2, 2008 | February 23, 2009 | January 21, 2010 |
| February 20, 2008 | February 24, 2009 | January 22, 2010 |
| February 21, 2008 | February 25, 2009 | January 23, 2010 |
| February 22, 2008 | February 26, 2009 | January 24, 2010 |
| February 23, 2008 | March 1, 2009 | January 25, 2010 |
| February 24, 2008 | March 2, 2009 | January 30, 2010 |
| March 19, 2008 | March 3, 2009 | February 4, 2010 |
| March 29, 2008 | March 21, 2009 | February 5, 2010 |
| April 22, 2008 | March 22, 2009 | February 6, 2010 |
| April 23, 2008 | April 9, 2009 | February 8, 2010 |
| October 3, 2008 | April 10, 2009 | February 9, 2010 |
| October 4, 2008 | May 1, 2009 | February 20, 2010 |
| October 30, 2008 | May 2, 2009 | February 23, 2010 |
| October 31, 2008 | May 3, 2009 | February 24, 2010 |
| November 1, 2008 | May 4, 2009 | February 26, 2010 |
| November 3, 2008 | June 3, 2009 | March 2, 2010 |
| December 14, 2008 | June 4, 2009 | March 3, 2010 |
| December 15, 2008 | September 14, 2009 | March 9, 2010 |
| December 18, 2008 | October 13, 2009 | March 10, 2010 |
| December 21, 2008 | October 19, 2009 | March 12, 2010 |

**EXHIBIT C – CSPA Proposition 65 Notice Letter**

# JACKSON & TUERCK

Attorneys at Law
429 Main Street
P.O. Box 148
Quincy, California 95971
tel. (530) 283-0406   fax (530) 283-0416

June 10, 2010

*(See attached Certificate of Service)*

## NOTICE OF VIOLATION OF
## CALIFORNIA HEALTH & SAFETY CODE §25249.5 *ET SEQ.*

Dear Public Enforcement Agencies and Mr. Matz:

This office represents the California Sportfishing Protection Alliance ("CSPA"), a California non-profit public benefit corporation with over 2,000 members. CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife and natural resources of California's waters, including the Feather River, the Sacramento River, the Sacramento-San Joaquin Delta and their tributaries.

CSPA has documented violations of California's Safe Drinking Water & Toxic Enforcement Act of 1986, codified at Health & Safety Code §25249.5 *et seq.* (also referred to as "Proposition 65"). This letter serves to provide you and the Violator with CSPA's notification of these violations. Pursuant to §25249.7(d) of the statute, CSPA intends to bring an enforcement action sixty (60) days after effective service of this notice unless the public enforcement agencies commence and diligently prosecute an action against these violations. A summary of the statute and its implementing regulations, which was prepared by the lead agency designated under the statute, is enclosed with the copy of this notice served upon the violator. The specific details of the violations that are the subject of this notice are provided below.

The name of the violator covered by this notice is RECOLOGY OF BUTTE COLUSA COUNTIES (hereinafter referred to as "Recology"). These violations involve the discharge of lead and lead compounds. These Proposition 65-listed toxins have been discharged, and are likely to continue to be discharged, by Recology from the facility located at 2720 S. Fifth Avenue, in Oroville, California ("the Facility") to the Feather River, which flows to the Sacramento River. The Feather River and the Sacramento River are designated as sources of drinking water in the "Water Quality Control Plan for the Sacramento River and San Joaquin River Basins," generally referred to as the "Basin Plan."

Information available to CSPA indicates that these ongoing unlawful discharges have been occurring since at least approximately 2005. As part of its public interest mission and to rectify these ongoing violations of California law, CSPA is interested in resolving these violations expeditiously, without the necessity of costly and protracted litigation.

Notice of Violation, Health & Safety Code §25249.5 *et seq.*
May 20, 2010
Page 2

       CSPA's address is 3536 Rainier Avenue, Stockton, CA 95204. The name and telephone number of the noticing individual within CSPA is Bill Jennings, Executive Director, (209) 464-5067. CSPA has retained legal counsel to represent it in this matter. Therefore, please direct all communications regarding this notice to CSPA's outside counsel in this matter:

Robert J. Tuerck
Jackson & Tuerck
429 Main Street, Suite C
P.O. Box 148
Quincy, California 95971
Tel. (530) 283-0406
Fax. (530) 283-0416
Bob@jacksontuerck.com


Very Truly Yours,

Robert J. Tuerck
JACKSON & TUERCK
Attorneys for Plaintiff
California Sportfishing Protection Alliance


cc: (see attached Certificate of Service)

## EXHIBIT D

| Parameter | Value |
|---|---|
| pH | 6.0 – 9.0 |
| Specific Conductivity | 200 μmhos/cm |
| Total Suspended Solids | 100 mg/L |
| Oil & Grease | 15 mg/L |
| Chemical Oxygen Demand | 120 mg/L |
| Biochemical Oxygen Demand* | 30 mg/L |
| Zinc | 0.117 mg/L |
| Iron | 1.0 mg/L |
| Aluminum | 0.75 mg/L |
| Lead | 0.0816 mg/L |
| Copper | 0.0636 mg/L |
| TPHd (diesel)* | 1.4 mg/L |
| Trichlorofluoromethane** | 0.5 mg/L |
| Mercury* | 0.0024 mg/L |

* If the storm water samples demonstrate that TPHd (diesel), Biochemical Oxygen Demand and Mercury levels are below the sampling values specified in the Exhibit D for three (3) consecutive sampling events, then they may be removed from the monitoring program.

** If the storm water samples demonstrate Trichlorofluoromethane below the sampling values specified in the Exhibit D for the first sampling event, they may be removed from the monitoring program. If the storm water samples do not demonstrate Trichlorofluoromethane below the sampling value specified for the first sampling event, they may be removed from the monitoring program when the sampling results are below the sampling values specified for three (3) consecutive sampling events.